# SAPONE & PETRILLO, LLP
*Boutique Litigation Law Firm*
40 Fulton Street / 17th Floor
New York, NY 10038
(O): (212) 349-9000
(E): ed@saponepetrillo.com
www.saponepetrillo.com

May 20, 2025

**BY ECF**
The Honorable LaShann DeArcy Hall
United States District Court for the
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

              Re: *United States of America v. Jin Hua Zhang (Changgui Huang)*
                *Docket No. 22-458 (LDH)*

Dear Judge DeArcy Hall:

      Defendant Changgui Huang ("***Changgui***") is a 33-year-old man who is doing one of the most important jobs in the world: supporting a child. Changgui sends financial support to his daughter, who is 10 years of age, and lives with her mother and Changgui's wife, Li Hua Lin, in China. Changgui also is a good son to his aging parents who also live in China and whom he also supports. His father, Fajun Huang, is 60 years of age; his mother, Dong Zhu Huang, is 57 years of age. All of Changgui's family members, except for his sister, Qui Xiang Huang ("***Qui***"), live in China.

      Qui fled China many years ago to come to the United States to seek employment opportunities. She advised us that Changgui is the cornerstone of his family. According to Qui,

if he were to be sentenced to a term of incarceration, the family would be ruined financially. His parents' health also depends on Changgui remaining at liberty. Finally, Qui shares that the mental health of Changgui's wife, Li, and their daughter would be harmed if Changgui were to be incarcerated. As Qui has two children of her own and a longtime partner to support, she does not have the resources to offer any support.

We are asking Your Honor to consider the kinds of sentences available and to fashion a principled, non-custodial sentence that satisfies the parsimony clause— i.e. a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing, while respecting the factors of 18 U.S.C. § 3553(a). Changgui is a zero-point offender, minor participant whose advisory Guidelines are 30 -37 months of incarceration. We suggest the following non-Guidelines sentence:

- Time-served;

- Three years of supervised release;

- Nine months of home confinement;

- Three hundred hours of community service; and

- Orders of restitution and forfeiture to be determined by the Court.

This recommended sentence will allow Changgui to continue to support his young daughter and elderly parents while being punished by the loss of his liberty, rehabilitated by doing honest service to our community, and being specifically deterred by the supervision of the Probation Department.[1] If Changgui were not be imprisoned, he would avoid being transferred to an immigration facility to be deported from the United States and separated from those who

---

[1] Specific deterrence is not a major concern as Changgui has remained compliant throughout his time on supervised release; he has conducted himself with respect for the Court, Pretrial Services, and the U.S. Probation Department.

2

rely on him; instead, he will be able to address his current deportation proceedings while he remains gainfully employed and is paying his anticipated orders of restitution and forfeiture.[2]

On January 24, 2024, Changgui pled guilty to one count of Money Laundering Conspiracy under 18 U.S.C. § 1956(h).  We recognize that this crime is serious, and that general deterrence is an important consideration.  But it is questionable whether general deterrence even works and, if it does, if it can be accomplished by those would-be-criminals who are similarly situated to Changgui knowing that crime doesn't pay: Changgui, an undocumented immigrant, was arrested, placed on conditions of pretrial supervision, and will have suffered the scarlet letter of a permanent federal felony conviction which will dash his dream of becoming a U.S. citizen and instead likely will cause his deportation to a country from which he worked hard to flee. His only chance of not being deported is if the immigration judge finds that Changgui's life will be in danger if he is deported to China.

<u>Nature and Circumstances of the Offense Under 18 U.S.C. § 1956(h)</u>

Between September 2020 and May 2022, Changgui participated in a scheme to defraud financial institutions.  And between July 2021 and July 2022, he participated in the operation of an unlicensed money transmitting business. Changgui also helped to convert cash into multiple cashier's checks at banks in Brooklyn, Queens, and Manhattan.  Finally, between December 2021 and July 2022, he used forged passports to further the fraudulent conduct.  Changgui was directed by others who were higher up in the criminal organization.  Although he had an understanding of the scope of the criminality, he had no insight into, nor any participation in, the

---

[2] Changgui's immigration status is an open question. He was required to be in immigration court earlier today.  His immigration judge expects Changgui and his immigration counsel to report back in July 2025.

3

decision-making function of the organization. As to Changgui's offense conduct, we note that his restitution amount is $165,438.96.

## The Applicable United States Sentencing Guidelines

Changgui's total offense level is 19, resulting in an advisory Guidelines range of 30-37 months of imprisonment.  As mentioned, he meets the criteria of U.S.G.G. §4C1.1(a)(1)-(10) as a Zero-Point Offender, and a minor role adjustment under U.S.G.G. §3B1.2(b) is appropriate. Each of these results in a two-level downward adjustment.

## History and Characteristics - 18 U.S.C. §3553(a)(1)

Changgui was born and raised in China under a strict communist regime and saddled by an underdeveloped economy.  His parents were oftentimes not around and so Changgui was mostly raised by his grandparents who fed and clothed him.  Had his parents not worked long hours year after year, they would not have been able to provide Changgui with the modest housing and necessities he recognized as home. When he was only 10 years of age, and after his sister had left China to pursue opportunities in the United States, both of his grandparents tragically died. Changgui was left to support himself.

Ultimately, 16 years later, in 2018, he was able to flee the brutal Chinese regime.  He came to the United States to pursue employment opportunities to support his loved ones.

Changgui is a loving family man.  Although he speaks with his family by telephone every day, he has not seen any of his family members since he arrived in the United States seven years ago, other than his sister. The only member of his family with whom he has had in-person contact is his sister, Qui, who left China when he was a boy. Changgui shares a close relationship with Qui. He very much appreciates the opportunity she provided to him by allowing him to

4

engage in honest work at New Silver Nail, her nail salon located in Brooklyn, the employment by which he is able to support his daughter and parents.

In 2014, Changgui met his wife, Li, whom he married a few years later. As mentioned, she is unemployed, remaining in China with the couple's young daughter, and is completely reliant on Changgui's financial and emotional support. Of Changgui, she writes:

> "My husband, Mr. Changgui Huang, has always been a kind, filial, and responsible person. He has consistently upheld his duties to our family and has been the pillar of our household. […] Our family needs him."[3]

Given his early history of caring for himself and his family's house, cooking meals, and helping to support his family, it came as no surprise that Changgui would sacrifice the comforts of his small family and familiar surroundings to take on unstable employment and small living quarters in the United States to continue to support his loved ones. Improving his own abilities and expanding his professional opportunities to better provide for his family was something he had come to expect from himself. Of Changgui's reliability, self-sacrifice, and determination to provide for his family and being the primary source of financial support, emotional comfort, and tenacity, Li says of her husband's essential role in the family:

> "All the burdens have fallen onto my husband alone. […] Our daughter needs her father's love and presence. His father needs his care and support."[4]

Despite being on opposite ends of the planet, they speak daily and rely on each other's emotional support. They imagined that Li and their daughter would soon follow Changgui to the United States so that they could remain together as a family unit, but since Changgui's arrest

---

[3] See Exhibit A2.

[4] Ibid.

5

they have not sought further developments for this plan. If Changgui were to be incarcerated, it would cause his wife and daughter extreme emotional and financial distress.  Understanding her son to be a "pillar of [her] family," Dongzhu Huang further says of Changgui:

> "My son was the main breadwinner of the household. Through his hard work, he held up the sky for us: he supported our family and held everything together."[5]

Changgui initially came to the United States to find employment opportunities.  He has applied for asylum, and his application is currently pending; during this interim period, he was given authorization to legally obtain employment, which, as mentioned, has happened with the help of Qui.

Changgui's ability to meaningfully contribute to his family and his community rests in his access to them and the ability to work in the U.S. or his home country. Of his diligence and attentiveness to the needs of his family, friends, and neighbors, his cousin Xingde says:

> "From a young age, [Changgui] grew up in a difficult environment. Despite this, he always remained optimistic and worked hard to prove himself. After moving to the United States, he faced immense cultural and financial pressure. […] Since facing the charges […] he has engaged in deep self-examination and has come to understand the damage his actions have caused to both the law and social order. This is not only evident in his words but also in the steps he has taken to make amends."[6]

Upon his arrival in the United States, Changgui was a diligent and committed worker, who was dedicated not only to providing for his family back home in China, but also in making a

---

[5] See Exhibit A4.

[6] See Exhibit A6. Please see Exhibits A8-A19 for additions letters of support from Changgui's family members.

6

difference in his community in New York. His former boss at the nail salon where he enjoyed two years of employment says of his work ethic and affability:

> "He quickly became an indispensable member of our warm and close-knit team. He has not only won the hearts of countless clients with his exceptional skills, but more importantly, has treated every customer who walked through our doors with genuine kindness and sincerity. Many regulars have specifically requested his service. His warm smile and professional attitude have truly become a hallmark of our establishment."[7]

Another colleague says of his working habits:

> "He has been the heart and soul of our team. His kindness, willingness to help others, and outstanding professional skills have left a lasting impression on each and every one of us. He is always the first to step up when problems arise."[8]

Many patrons of his also wrote to express their support for their manicurist. One such returning customer says of his skill, professionalism, and gregariousness:

> "[He] has been a bright spot in my busy life and a source of emotional comfort. […] Not only is he technically excellent and always able to capture my preferences with precision, but even more rare is his patience and attentiveness."[9]

Many friends from his childhood and adulthood have commented on his generous and caring spirit, which they see reflected in how he cares for his family and in his diligent work ethic. Changwu Huang says of his childhood friend:

> "We have known each other since we were young, and I am deeply familiar with his character and qualities. […] I believe [the instant offense] does not define him as a whole. Since the incident, Changgui has felt deep remorse. He has taken responsibility and is

---

[7] See Exhibit C2.

[8] See Exhibit C4.

[9] See Exhibit C6. Please see Exhibits C8-C9 for an additional letter of support from Changgui's colleague Jiamin Xie.

7

actively seeking to correct his mistakes."[10]

Another friend whom he grew up with, Shanshan Huang, affirms that:

> "Throughout his life, he has been a kind and honest person. This incident was a serious mistake, but one that does not define his character. He sincerely hopes for Your leniency and a chance to turn over a new leaf. He has reflected deeply on his actions and has made a firm commitment to abide by the law from now on."[11]

Jinhua Huang says of her friend Changgui:

> "He is a kind and warm-hearted individual, always willing to help others and show concern for those around him. His family and friends all know his true character. […] I firmly believe that he will learn from this experience, cherish his future even more, and strive to become a person who contributes positively to society."[12]

In speaking to Changgui's friends, family, coworkers, and other people in his community, it is evident that he has many people who support him, admire him, and view his role in the community as a generous and respected man.[13] As this Court weighs the various sentencing factors set forth in 18 U.S.C. § 3553(a), I humbly ask that the Court to not view the person before the Court as a man defined by his mistakes but, as all of the support letters indicate, a deeply dedicated father and a valuable member of his wider community, who would all be significantly negatively impacted by any incarceration.

---

[10] Exhibit B2.

[11] Exhibit B4.

[12] Exhibit B6. Please see Exhibits B8-B27 for additional letters of support from Changgui's friends.

[13] See Exhibit D for additional letters of support from those in Changgui's community.

8

<u>Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment</u>

As the Court reflects upon the whole person being sentenced, I urge Your Honor to consider that the requested sentence will reflect the seriousness of the offenses, promote respect for the law and provide just punishment. Changgui deeply regrets what he did. His mistakes, however, do not define the man being sentenced. The numerous attached letters demonstrate that he is a hard-working, caring individual who is devoted to his family.

For its part, the Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." (Alternative Sentencing in the Federal Criminal Justice System, United States Sentencing Commission, January 2009, pg. 1). Changgui is a nonviolent offender. He does not need to be incarcerated to be punished, especially if his prompt deportation is the only foreseeable future after any term of imprisonment. The requested sentence will mean that he, at the end of all proceedings, will have spent more than five years reporting to either a U.S. Pretrial Services officer or a U.S. Probation officer and being subjected to strict supervision. *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions that substantially restrict their liberty"); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled").

Further, in addition to the obvious consequences Changgui will suffer as a result of any sentence the Court imposes, he has faced, and will continue to face, numerous collateral

9

consequences. And he has incurred deep shame from his family, though he nonetheless retains their continued support.

Further, Changgui likely will face what is perhaps the most consequential punishment of all: having to leave the United States and return to the strict communist regime of the People's Republic of China. Should he ever wish to return to the United States, his felony record surely will prevent reentry.

In addition, and as already touched upon, the requested sentence can provide adequate general and specific deterrence. The available empirical evidence does not support a finding that a lengthy prison sentence necessarily leads to increased deterrent effects, regardless of the type of crime. See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

Nonetheless, the requested sentence sends a powerful message to the community that this kind of criminality will not be tolerated. No one looking at Changgui's case would think that engaging in the criminal acts in which he engaged will pay any dividends. Studies have also demonstrated that, except for the incapacitation effect of incarceration, there is little apparent

10

correlation between recidivism and imprisonment.  See David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of more than a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Commission has similarly found that "[t]here is no correlation between recidivism and Guidelines' offense level. … While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: *The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).

A more relevant predictor of recidivism is a defendant's criminal history, of which Changgui has none.  Social science research indicates low recidivism rates for offenders with no prior criminal history. In 2004, the Commission issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender'': A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004. In its report, the Commission notes:

11

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

Id., p. 1; see also 28 U.S.C. § 994(j).

The Commission found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). See id., p. 13-14, 26. This is also assuming that the same criminal apparatus or playing field is adequately available to the would-be offender: in Changgui's case, removing him from the advanced economy of the United States, the myriad professional and criminal opportunities, and the undocumented imperative that he make enough money to support himself, to prove his economic worth to the asylum commission, and to have enough to send home to his family all will have been removed. If for no other reason, of which I have presented many, Changgui, having been deported to China, simply would not have the opportunity to offend again.

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only '"ever-count' offenses specified under U.S.S.G. §4A1.2(c)(2)). *See id.*, p. 14, 26. The Commission notes: "Its low recidivism rate makes first offender group A stand out. Recall that group A offenders have no prior criminal events, not even a prior arrest." *Id.*, p. 14.

12

Conclusion

While we recognize the seriousness of the offense, we respectfully request that Your Honor exercise your authority to allow Changgui to forgo incarceration. The advisory Guidelines range of 30 - 37 months of incarceration for this zero-point offender, and minor participant of this non-violent offense is low enough such that a non-custodial sentence with the special conditions of release requested will not amount to a disparity in sentencing. We firmly believe that the requested sentence will satisfy the parsimony clause and achieve the objectives of 18 U.S.C. §3553(a)(2).

On behalf of Changgui and his family, we thank Your Honor for considering this memorandum, and we look forward to addressing the Court on June 6th at 12:30 p.m.

Respectfully submitted,

*/s/ Edward V. Sapone*
Edward V. Sapone (ES-2553)

cc: AUSA Benjamin Weintraub (by ECF)